UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JJKITA LENOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-CV-869 JD |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Jjkita Lenox applied for social security disability benefits, claiming that she was

disabled because of her lupus, depression, anxiety, and intellectual disability. An administrative

law judge found that despite her disabilities, Ms. Lenox retained the ability to work, so she was

not disabled. Ms. Lenox appeals that decision, focusing solely on the step-three finding that she

did not meet the listing for an intellectual disability. For the reasons explained below, the Court

finds that the decision was supported by substantial evidence, so the Court affirms.

**I. FACTUAL BACKGROUND**

Ms. Lenox filed applications for social security disability benefits and supplemental

security income, alleging that she became unable to work due to her disabilities beginning in

August 2012. Ms. Lenox has been diagnosed with depression, anxiety, and obsessive compulsive

disorder, for which she periodically sought treatment. She also began complaining of joint pain

in June 2013, and was eventually diagnosed with lupus.

Ms. Lenox underwent a consultative psychological evaluation by Dr. Todd Snyder in

June 2013. Dr. Snyder noted that Ms. Lenox had attended special education classes in school and

had attended school only until the ninth grade. As an adult, however, Ms. Lenox had worked in a

childcare center for five years, and in a nursing home as a housekeeper for around six months. She also cared for her three children and performed household chores. Dr. Snyder administered an IQ test, which reflected a full scale IQ score of 67. Dr. Snyder noted that an IQ score in that range is typically associated with mild mental retardation (now referred to as intellectual disability), and that she had "significant intellectual aptitude limitations that have limited her success in many job situations and academic pursuits." (R. 500). However, Dr. Snyder also found that Ms. Lenox's "functional skills for daily living appear to be somewhat higher than that of most individuals with a [full scale IQ] this low." (R. 500). Accordingly, he concluded that the appropriate diagnosis was "Borderline Intellectual Functioning"—not intellectual disability. *Id.* He further opined that Ms. Lenox had moderate symptoms of generalized anxiety disorder and mild symptoms of obsessive compulsive disorder and depression.

Ms. Lenox later underwent another consultative examination with Dr. Craig Nordstrom. Dr. Nordstrom noted that Ms. Lenox struggled with reading and writing and had "significant deficits in functional academic skills." (R. 618, 621). He also found, however, that her thought processes appeared logical and her behavior appeared goal-directed, that she was able to care for her personal needs and hygiene, and that she was able to cook and perform household chores. Dr. Nordstrom also noted that Ms. Lenox had run her own childcare business and appeared to function fairly well in math, and he opined that she could manage her funds independently. (R. 620–21). He also noted that she suffered from depressive symptoms that likely caused her to avoid social interaction. Over the course of Ms. Lenox's claim, several agency doctors reviewed her records; none found that she met a listing or that she qualified as intellectually disabled.

After first appearing at a hearing without representation, Ms. Lenox decided to retain counsel. A new hearing was then convened with counsel present, but that hearing had to be

adjourned due to a lack of time. Ms. Lenox thus appeared with counsel before a different ALJ several months later. Ms. Lenox's attorney had previously submitted a brief arguing that she met Listing 12.05C, for intellectual disability. Her attorney also requested that the ALJ obtain records from a previous application for benefits from when Ms. Lenox was a child. He argued that those records would be relevant to showing that her intellectual disability manifested before the age of 22, which is one of the requirements of that listing. The ALJ declined, explaining that the onset date of the condition was not likely to be at issue, but that if it was she would consider those records. (R. 70–71).

Ms. Lenox then testified at the hearing. She testified that she had lived alone with her three children for the past year, before which she lived with her aunt. She was the only adult in the household and she was the primary caregiver for her children, ages 4, 7, and 13. She testified that she had previously worked at a childcare center, and had also run her own babysitting business for several years, watching up to six kids at a time. She had also worked as a housekeeper in a nursing home. As to her limitations, Ms. Lenox testified that her fingers and legs would occasionally lock up due to her lupus. She also testified that she experienced anxiety and panic attacks, and that someone would always go with her when she went to the store. She also noted that she struggled with reading and writing and had been in special education classes in school. The hearing concluded after testimony from a vocational expert.

The ALJ subsequently issued a decision finding that Ms. Lenox did not qualify as disabled. The ALJ found at step two that Ms. Lenox had severe impairments including lupus, persistent depressive disorder, obsessive compulsive disorder, generalized anxiety disorder, and subaverage intellectual functioning. The ALJ then considered several listings at step three. Of note here, the ALJ found that Ms. Lenox did not meet listing 12.05C, for intellectual disability.

In particular, the ALJ found that Ms. Lenox did not meet the diagnostic criteria for intellectual disability, which is a threshold requirement for the listing, because she did not have deficits in adaptive functioning. In support of that finding, the ALJ noted that Ms. Lenox had struggled academically as a child, but that as an adult, she engaged in numerous activities including caring for her children, and she had worked as a babysitter, as a housekeeper, and in a childcare center. The ALJ also noted, among other factors, that Dr. Snyder opined that Ms. Lenox had a higher level of functioning than one would expect based on her IQ scores.

Having found that Ms. Lenox did not meet a listing, the ALJ proceeded to steps four and five, at which she concluded that Ms. Lenox was unable to perform her past work but could perform other jobs. Accordingly, the ALJ found that Ms. Lenox did not qualify as disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Ms. Lenox thus filed this action seeking judicial review of that decision.

## II. STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. While the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III.  STANDARD FOR DISABILITY

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The steps are to be used in the following order:

1.  Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, then in between steps three and four, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545. The ALJ then uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## IV. DISCUSSION

Ms. Lenox's arguments on appeal each focus on the ALJ's listing analysis at step three. She argues that the ALJ misinterpreted the requirements of Listing 12.05C and that the ALJ's finding that she did not satisfy that listing was not supported by substantial evidence. She also argues that the ALJ should have obtained records from a prior disability adjudication over ten years earlier. The Court disagrees, and finds that the ALJ's opinion was sound and supported by substantial evidence.

Ms. Lenox argues that she met Listing 12.05C, which applies to intellectual disabilities. At the time of the ALJ's decision, that listing stated:

> 12.05 Intellectual disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. pr. 404, subpt. P, App. 1, § 12.05.[1] Thus, to meet this listing, claimants must have significantly subaverage intellectual functioning, they must have deficits in adaptive functioning, and the condition must have manifested prior to age 22. Claimants then have to meet the criteria in one of the subparagraphs, which, as relevant here, require an IQ of 60 through 70 and another severe impairment.

The ALJ found that Ms. Lenox did not meet this listing because she did not satisfy all of the threshold diagnostic criteria.[2] Specifically, the ALJ found that the evidence did not show that Ms. Lenox had the requisite deficits in adaptive functioning, which the Seventh Circuit has

---

[1] The listing has since been revised. The Court cites to the version of the listing that was in effect on the date of the ALJ's decision.

[2] The decision also stated that Ms. Lenox did not have an IQ of 60 through 70 and another impairment imposing an additional and significant limitation. (R. 22.) That sentence appears to be mistaken, and the Court agrees with Ms. Lenox that the decision cannot be affirmed on that basis, as the ALJ noted that Ms. Lenox did have an IQ score of 67 and that she had other severe impairments. However, that does not affect the ALJ's conclusion that Ms. Lenox did not have the required deficits in adaptive functioning, which was the focus of the decision's analysis.

construed to mean an "inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). The ALJ explained this finding as follows:

> [T]he evidence fails to document the deficits of adaptive functioning described in the listing. The claimant struggled while in school, which her attorney argued established deficits in adaptive functioning. However, aside from poor grades, the school records do not describe the claimant's specific degree of functioning. Rather, the records during the relevant period show that the claimant had adequate adaptive functioning. She displayed appropriate behavior at exams, which she engaged in numerous daily activities including caring for her children, as noted above. She has lived on her own in the past, she provided babysitting services to earn a little extra money, she worked in a nursing home as a housekeeper for six months in the past, and she worked in a child care center for five years, albeit not always at substantial gainful activity levels. While these activities are not dispositive, they also do not suggest significant deficits in adaptive functioning, such as those contemplated by the capsule definition of an intellectual disability. Additionally, her psychological treatment providers generally believed that the claimant demonstrated average intellectual functioning. In fact, the consultative examiner who administered the IQ test indicated that the claimant demonstrated a higher level of functioning than one would expect based on her IQ scores. Accordingly, the undersigned finds that the claimant's conditions do not meet listing 12.05.

(R. 22).

In challenging that finding, Ms. Lenox first argues that the ALJ misinterpreted the requirement that a claimant have deficits in adaptive functioning. She argues in part that the ALJ erred by not evaluating this requirement under the criteria promulgated by the American Psychiatric Association. However, the Seventh Circuit has rejected that exact same argument. In *Charette v. Astrue*, 508 F. App'x 551, 553 (7th Cir. 2013), the plaintiff argued that the ALJ should have used the American Psychiatric Association's definition of deficits in adaptive functioning. The Seventh Circuit disagreed, holding that the listing "did not . . . require an ALJ to use a specific measurement method." 508 F. App'x at 553. It noted in fact that no circuit has imposed such a requirement. *Id.* Instead, the court held that "[b]ecause the ALJ examined [the plaintiff's] ability to cope with the challenges of daily life, she applied the correct legal standard." *Id.* The ALJ here engaged in that same analysis, and for the same reasons, the Court

cannot conclude that the ALJ erred by failing to adopt the American Psychiatric Association's definition of deficits in adaptive functioning.

Ms. Lenox also appears to suggest that a claimant need not separately establish defects in adaptive functioning. She suggests that the listing's language about defects in adaptive functioning that manifested prior to the age of 22 is not meant to impose a requirement but merely to distinguish intellectual disability—an innate condition—from other mental disabilities that may manifest later in life. [DE 18 p. 11–12]. She thus argues that because she meets the two criteria in paragraph C of the listing (an IQ of 60–70 and another severe impairment), she necessarily meets the listing. However, Ms. Lenox disavows such an argument in her reply brief [DE 20 p. 1 ("There is no doubt that Listing 12.05C requires a showing of adaptive functioning deficits . . . .")], and for good reason.

As the listing itself explains, "Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00A (emphasis added); *see also* 20 C.F.R. § 404.1424(c)(3) ("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction . . . ."). Thus, the ALJ correctly recognized that Ms. Lenox first had to meet the listing's threshold diagnostic description, which does require a finding that the claimant's intellectual functioning results in deficits in adaptive functioning. *Novy*, 497 F.3d at 709 (affirming the denial of benefits because the claimant failed to demonstrate deficits in adaptive functioning); *Charette*, 508 F. App'x at 553–54 (likewise); *Adkins v. Astrue*, 226 F. App'x 600,

604–05 (7th Cir. 2007). Accordingly, the fact that Ms. Lenox meets the two criteria in paragraph C does not alone mean that she meets the listing.

Contrary to Ms. Lenox's argument that the ALJ misunderstood this requirement, the Court finds that the ALJ's analysis was fully consistent with the Seventh Circuit's holdings on this issue. As noted above, the Seventh Circuit has explained that deficits in adaptive functioning "denotes inability to cope with the challenges of ordinary everyday life." *Novy*, 497 F.3d at 710. The question is not whether a claimant suffers limitations and challenges as a result of her intellectual functioning, but whether she is able to overcome and cope with them. *Id.*; *Charette*, 508 F. App'x at 553–54. The Seventh Circuit has explained that while "low IQ scores are indicative of [intellectual disability], other factors, such as the claimant's life activities and employment history, must be considered and weighed and properly play into the ALJ's analysis." *Adkins*, 226 F. App'x at 605. Thus, in *Novy*, for example, the court affirmed the ALJ's finding that this requirement was not met, in a discussion that could nearly be describing the ALJ's decision here:

> [T]he administrative law judge was on firm ground in finding that [the plaintiff] can cope. She lives on her own, taking care of three children . . . without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction. Her intellectual limitations pose serious challenges to her ability to raise a family on her own. But she has overcome those challenges well enough that she should be able to hold down a full-time job— or so at least the administrative law judge was entitled to conclude without courting reversal.

*Novy*, 497 F.3d at 710; *see also Charette*, 508 F. App'x at 554 ("[T]he ALJ identified the limitations [the plaintiff] faces, such as difficulty remembering tasks and reading, and then discussed how he overcomes them well enough to live independently, manage household chores, take care of his pets, and socialize with other people. Substantial evidence in the record supports

the conclusion that [the plaintiff] has been able to cope with the difficulties of daily life despite his intellectual limitations.").

The ALJ's analysis here closely parallels the Seventh Circuit's analysis in those cases. The ALJ acknowledged that Ms. Lenox has subaverage intellectual functioning and that she faces challenges in some areas. (R. 19, 21–23, 25–26). However, the ALJ noted that Ms. Lenox had lived alone and cared for her children, and that she engaged in daily activities that included preparing simple meals, cleaning, doing laundry, and paying her bills. (R. 21–22). The ALJ also noted Ms. Lenox's work history, which included running her own babysitting business out of her home (in which she watched up to six kids at a time (R. 83)), working as a housekeeper in a nursing home, and working in a childcare center for five years. (R. 22). The ALJ further noted that Ms. Lenox's treatment providers generally described her as having average intellectual functioning, and that the consultative examiner opined that Ms. Lenox had a higher level of functioning than expected based on her IQ scores, which prompted the examiner to conclude that the proper diagnosis was borderline intellectual functioning, not intellectual disability. (R. 22, 499–500). Those same factors satisfied the Seventh Circuit in the cases just discussed.

In arguing to the contrary, Ms. Lenox relies almost entirely on a decision by another district court in *Anthony v. Astrue*, No. 1:10-cv-136, 2011 WL 2728059 (S.D. Ind. July 12, 2011). That decision is not analogous, though, as the ALJ there confined the entire analysis on this issue to a footnote and failed to confront evidence of the plaintiff's limitations. 2011 WL 2728059, at *3. As just discussed, the ALJ here did not do so. She offered a thorough explanation of her finding, acknowledged the evidence both of Ms. Lenox's limitations and of her ability to overcome them, and relied on the same factors that the Seventh Circuit has found in

multiple cases to be sufficient to demonstrate a lack of deficits in adaptive functioning.[3] Thus, the Court rejects Ms. Lenox's argument that the ALJ erred by misinterpreting the listing.

Ms. Lenox next argues that the ALJ's finding was not supported by substantial evidence because it mischaracterized the record and failed to discuss relevant evidence. "The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions so that [courts] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). "Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, [courts] give it a commonsensical reading." *Id.*; *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) ("In analyzing an ALJ's opinion for . . . fatal gaps or contradictions, we give the opinion a commonsensical reading rather than nitpicking at it."); *Burnam v. Colvin*, 525 F. App'x 461, 464 (7th Cir. 2013) ("On appeal [the plaintiff] takes a kitchen-sink approach, listing nearly a dozen perceived errors in the ALJ's medical summary . . . . But these purported mistakes represent the type of 'nitpicking' of the ALJ's decision that we refuse to engage in."). Ms. Lenox offers a laundry list of criticisms of the factual discussion in the ALJ's decision, and the Court addresses each in turn. In sum, however, the Court finds that the ALJ fairly and accurately discussed the evidence in the record, and that Ms. Lenox has not identified any error or omission in the ALJ's analysis that would warrant remand.

The Court begins with the medical evidence. Ms. Lenox first takes issue with the ALJ's statement that "her psychological treatment providers generally believed that the claimant demonstrated average intellectual functioning." (R. 22). That is a true statement, though. In each

---

[3] Moreover, the record does not reflect that any doctor has diagnosed Ms. Lenox with intellectual disability or opined that she met the criteria for that diagnosis.

of her treatment sessions in the year prior to the ALJ's decisions, the treatment provider had described Ms. Lenox's intelligence as "average." In the treatment notes from Ms. Lenox's June 2016 appointment, the provider wrote: "Level of intelligence- average . . . ." (R. 706). The same treatment provider offered the same assessment in a note from an appointment the previous month. (R. 711 ("Level of intelligence- average . . . .")). The month before that, a different treatment provider wrote that Ms. Lenox "appears to be of average intellect." (R. 716).

As Ms. Lenox notes, her treatment providers did not *always* describe her as having average intellect. Several years prior, a provider wrote that Ms. Lenox "appeared of below average intellect," (R. 479), and a year before that another provider described her intellect as "low average." (R. 490).[4] That is not inconsistent with the ALJ's decision, though. First, the ALJ wrote that the treatment providers "generally" described Ms. Lenox as having average intellect, not that they always did so. And second, the ALJ expressly found that one of Ms. Lenox's severe impairments was "subaverage intellectual functioning." (R. 19). Plainly, the ALJ did not believe that Ms. Lenox did have average intellectual functioning; the point was that Ms. Lenox functioned at a high enough level that her treatment providers generally perceived her as having average intellectual functioning. (R. 22). That is a fair characterization of the record, and supports the ALJ's finding (though it was a minor point in the ALJ's analysis).

---

[4] Ms. Lenox also argues that this statement is false because Dr. Snyder found her to have below average intellectual functioning. However, Dr. Snyder was a consultative examiner, not a treatment provider, so that fact is not responsive to the ALJ's statement. And as discussed below, the ALJ expressly acknowledged and addressed Dr. Snyder's evaluation. Ms. Lenox also notes that Dr. Nordstrom, another consultative examiner, opined that she had deficits in her functional academic skills. (R. 619). Again, however, the ALJ acknowledged that evidence, but further noted Dr. Nordstrom's observations that Ms. Lenox had run her own childcare business and functioned well in math. (R. 26, 620–21). That analysis of both a claimant's limitations and her ability to overcome them is exactly the analysis that the Seventh Circuit requires. *Novy*, 497 F.3d at 710; *Charette*, 508 F. App'x at 554.

Ms. Lenox next argues that the ALJ misinterpreted an opinion by Dr. Snyder, a consultative examiner. In evaluating whether Ms. Lenox had deficits in adaptive functioning, the ALJ wrote that "the consultative examiner who administered the IQ test indicated that the claimant demonstrated a higher level of functioning than one would expect based on her IQ scores." (R. 22). Later in the decision, the ALJ wrote, "Dr. Snyder observed that the claimant's daily activities appeared to be higher than most individuals with such IQ scores." (R. 25). Ms. Lenox argues that these statements mischaracterized Dr. Snyder's opinion, which she argues was much narrower. Ms. Lenox notes that Dr. Snyder's precise words were that "her functional skills for daily living appear to be somewhat higher than that of most individuals with a FSIQ [Full Scale IQ] this low." (R. 500). She then surmises that Dr. Snyder was not opining that she lacked deficits in adaptive functioning, but was only noting an area of relative strength in one particular kind of adaptive functioning.

Ms. Lenox's argument takes Dr. Snyder's statement out of context, though, and is not supported by the record. Dr. Snyder began this portion of his discussion by noting that Ms. Lenox's IQ score "indicates intellectual abilities in the range that is typically associated with mild mental retardation [now referred to as intellectual disability]." (R. 499). He then noted, however, that "her functional skills for daily living appear to be somewhat higher than that of most individuals with a FSIQ this low." (R. 500). Dr. Snyder then concluded: "As a result, a diagnosis of Borderline Intellectual Functioning appears to be more appropriate at this time." *Id.*[5] Thus, Dr. Snyder was plainly contrasting Ms. Lenox's level of functioning against the level of functioning that would warrant a diagnosis of intellectual disability, and concluded on that basis

<hr>

[5] Despite block-quoting the entire paragraph leading up to this sentence, Ms. Lenox's brief omits this conclusion. [DE 18 p. 17].

that such a diagnosis was not warranted. In other words, his opinion was that, due to her level of functioning, Ms. Lenox did not meet the diagnostic criteria specified in the listing for an intellectual disability. Dr. Snyder's opinion thus fully supports the ALJ's finding, and the ALJ fairly characterized and relied on that opinion.

Ms. Lenox also faults the ALJ's reliance on a variety of non-medical evidence, but those criticisms fare no better. Ms. Lenox objects that the ALJ noted in a previous part of the decision that Ms. Lenox "watched television with little indication that she could not follow the programming." (R. 21). Ms. Lenox argues that no evidence supports the assertion that she could follow the programming, but that is not true: Ms. Lenox herself reported to a social security representative that she "enjoys watching tv, [and has] no problem following menu options on tv or 30 mins program provided she is not having too much pain in her joints or her kids are not needing her attention." (R. 394). Ms. Lenox next objects that the ALJ noted that she is able to pay her bills, (R. 21), yet failed to note that Ms. Lenox checked "no" in that same form to indicate that she is unable to use a checkbook or money orders. (R. 452). To explain the "no" answer, Ms. Lenox wrote: "never had a checkbook." *Id.* The fact that Ms. Lenox had never had a checkbook does not undermine the ALJ's acknowledgement that she was able to pay her bills, nor is it significant enough that the ALJ needed to expressly recite that fact in the decision.

Ms. Lenox also objects that, in describing her social functioning, the ALJ noted that she "was able to go out shopping without apparent significant problems," (R. 21[6]), without further

---

[6] As Ms. Lenox notes, the ALJ's citation for this statement appears to contain a typo, as it cites to "7E/4," (R. 21), but the function reports discussing Ms. Lenox's shopping appear at "7E/5" (R. 404 (a function report by Ms. Lenox's aunt indicating that Ms. Lenox goes shopping with her twice a month for half an hour "until she gets frustrated") and "17E/4." (R. 452 (a function report in which Ms. Lenox reported that she shops "in stores" for "food, [and] stuff for my kids," and that she shops "like once a month" but "not long" because she "do[es]n't like to be around a lot of people")).

noting her testimony that her aunt or mother would accompany her when she goes grocery shopping, as she testified that she might get nervous or overwhelmed if she went on her own. (R. 56). Though the ALJ did not recite that particular fact, the ALJ did address and account for the limitations in Ms. Lenox's social functioning. The ALJ acknowledged that Ms. Lenox had "moderate difficulties" in the domain of social functioning, (R. 21), and the ALJ discussed those limitations later in the opinion in finding that Ms. Lenox's mental conditions restricted her to "occasional" interactions with others, (R. 26).[7] But the ALJ also noted in contrast to those difficulties that Ms. Lenox "attended church every week despite her social limitations." (R. 21, 25). Thus, even if the ALJ's characterization that Ms. Lenox could go shopping without "significant problems" may have been understated if Ms. Lenox really needed accompaniment to go shopping, it is still clear that the ALJ was aware of and accounted for the evidence of Ms. Lenox's limitations in social functioning. And given that Ms. Lenox's grocery shopping played little role, if any, in the ALJ's analysis of her deficits in adaptive functioning, the Court cannot find that the omission of that single fact undermines the ALJ's decision. *See also Charette*, 508 F. App'x at 554 ("The ALJ properly evaluated both [the plaintiff's] limitations and his adaptive ability to overcome them, including his ability to reach out to friends and neighbors for help.").

Ms. Lenox's other criticisms are insubstantial. She faults the ALJ for noting that she "was able to follow the proceedings at the hearing and answer questions appropriately," as she argues that there is no indication that she actually understood the discussions at the hearing. But an ALJ is entitled to rely on observations of a claimant during a hearing. *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). And Ms. Lenox's ability to follow the proceedings and answer questions

---

[7] Notably, the ALJ attributed those limitations to Ms. Lenox's "depressive symptoms," not her level of intellectual functioning. (R. 26).

fairly supports the ALJ's conclusion that her difficulties with regard to concentration, persistence, and pace were "moderate," which is the proposition for which the ALJ cited this evidence. (R. 21). She also argues that the ALJ erred in noting that she did not report or exhibit significant mental health symptoms when being treated for her physical impairments, and that she demonstrated generally normal cognition during her mental health exams. (R. 26). However, the ALJ's statements in those regards accurately reflected the evidence. Nor is it improper for the ALJ to consider whether Ms. Lenox exhibited or reported mental health symptoms during treatment for her physical impairments; it is perfectly logical for an ALJ in evaluating the severity of a condition and the credibility of a claimant's complaints to consider whether those conditions were apparent even in other contexts, or only when they were seeking treatment for those conditions. And in any event, this discussion had nothing to do with the ALJ's analysis of Ms. Lenox's adaptive functioning—the ALJ made these points in evaluating Ms. Lenox's "depression, anxiety, and paranoia." (R. 26). Thus, even if the ALJ had erred in that respect, Ms. Lenox has not shown why that would have any effect on the ALJ's finding as to her lack of deficits in adaptive functioning.[8] *See Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (holding that "an applicant's inadequate adaptive functioning must arise from her cognitive limitations, rather than from a physical ailment or other infirmity").

Moreover, even if the ALJ had erred in one or more of these regards, that would not be dispositive—the standard of review is whether the decision is supported by substantial evidence,

---

[8] Ms. Lenox also argues for the first time in her reply brief that she has problems caring for her children. However, that argument is waived for being raised for the first time in a reply. In addition, the only factual support for that argument is the function report completed by Ms. Lenox's aunt. The ALJ acknowledged the aunt's statements and explained the reasons why she chose to give them little weight. (R. 25–26). Ms. Lenox fails to acknowledge or confront that discussion, and has thus waived this argument for that additional reason.

not whether it is flawless and comprehensive. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (holding that a decision need not be "flawless" to be affirmed); *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are[.]").[9] For the reasons explained at greater length above, the Court finds that the ALJ's finding was supported by substantial evidence, including Ms. Lenox's work history; her ability to live alone, take care of her children, pay her bills, and complete household chores; and the medical opinions that declined to offer a diagnosis of intellectual disability. None of Ms. Lenox's criticisms materially undermine that analysis.

Finally, Ms. Lenox argues that the ALJ failed to fully develop the record because the ALJ did not obtain records from Ms. Lenox's application for benefits as a child. Those records would not have been relevant to the ALJ's finding, though. Ms. Lenox's counsel argued to the ALJ that those records were necessary "because the time of the manifestation of the intellectual disability is at issue in the case." (R. 472). However, the ALJ's finding that Ms. Lenox did not meet the listing did not depend on when her condition manifested; as discussed above, the ALJ found that Ms. Lenox did not have deficits in adaptive functioning, a distinct requirement of the listing. The ALJ explained that at the hearing, noting that whether the symptoms manifested prior to the age of 22 was not "the issue in this claim," and that "those childhood records are not going to demonstrate . . . deficits in adaptive functioning as a threshold issue . . . ." (R. 70–71). Counsel

---

[9] *See also Kelham v. Berryhill*, No. 18-2064, 2018 WL 5733354, at *4 (7th Cir. Oct. 31, 2018) ("[E]ven if Kelham were correct that the ALJ improperly evaluated portions of these doctors' notes, that error would not be dispositive. We will uphold the ALJ's decision if it is supported by substantial evidence. And significant evidence supports the conclusion that Kelham is able to work . . . . Kelham fails to explain why selective comments from a couple of doctors' notes undermine the overall substantial evidence supporting the ALJ's decision.").

responded by arguing that the criteria of paragraph C were met, at which point the ALJ reiterated that "the threshold issue under the capsule definition of 12.05 . . . also requires some evidence of deficits in adaptive functioning." (R. 71). As the ALJ noted, Ms. Lenox had the opportunity to offer testimony on that point during the hearing, but Ms. Lenox has not shown that the records from over a decade prior, when she was a child, would have shed any meaningful light on her deficits in adaptive functioning as an adult.

For each of those reasons, the Court finds that the ALJ's finding at step three that Ms. Lenox did not meet the listing for intellectual disability was supported by substantial evidence.[10] Accordingly, the Court must affirm the Commissioner's decision.

## V.  CONCLUSION

For those reasons, the Court AFFIRMS the Commissioner's decision. The Clerk is directed to enter judgment accordingly.

SO ORDERED.

ENTERED:  December 4, 2018

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

---

[10] Ms. Lenox's reply brief makes passing reference to the ALJ's residual functional capacity analysis, but any argument on that ground is waived, both for being undeveloped and for being raised for the first time in a reply.